[Cite as *Bower v. Henry Cty. Hosp.*, 2013-Ohio-2844.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

MEAGAN BOWER, M.D.,

    PLAINTIFF-APPELLANT,          CASE NO. 13-12-46

    v.

HENRY COUNTY HOSPITAL, ET AL.,     O P I N I O N

    DEFENDANTS-APPELLEES.

Appeal from Seneca County Common Pleas Court
Trial Court No. 10CV0649

**Judgment Affirmed**

**Date of Decision: July 1, 2013**

APPEARANCES:

    *John D. Franklin* for Appellant

    *Jennifer J. Dawson and Jill K. Bigler* for Appellees

**ROGERS, J.**

{¶1} Plaintiff-Appellant, Meagan Bower, M.D., appeals the judgment of the Court of Common Pleas of Seneca County granting summary judgment in favor of Defendants-Appellees, Henry County Hospital ("HCH") and Kimberly Bordenkircher (collectively, "Appellees"), on her claim for gender discrimination under R.C. 4112.02. On appeal, Dr. Bower argues that the trial court erred in granting summary judgment because it improperly concluded that there was not an employer/employee relationship between her and Appellees. Dr. Bower also asserts that there is a genuine issue of material fact as to whether Appellees engaged in discriminatory practices when they terminated her employment. For the reasons that follow, we affirm the trial court's judgment.

{¶2} This matter arose from Dr. Bower's termination from her placement as an occupational health physician at HCH on March 30, 2007, which was also the day that her employment ended with the company that placed her at HCH, Ohio Occupational Health P.C., Inc. ("OOH"). Dr. Bower filed her original complaint on December 28, 2010, naming Appellees and OOH as defendants.[1] The original complaint asserted both a breach of contract and gender discrimination claim against all of the named defendants. After the filing of various motions to dismiss,

---

[1] Dr. Bower also named Select Medical Corporation ("Select") and HealthLink of Henry County Hospital ("HealthLink") as defendants. However, on July 12, 2011, Select was dismissed from this matter on the basis that it was not Dr. Bower's employer. Dr. Bower has not questioned this dismissal on appeal. Moreover, Dr. Bower did not include HealthLink as a defendant in her amended complaint.

however, Dr. Bower filed an amended complaint, with leave of court, on June 14, 2011. The amended complaint only asserted the breach of contract claim against OOH and reasserted Dr. Bower's gender discrimination claim against OOH and Appellees.

*The Commencement of Dr. Bower's Employment*

{¶3} OOH was a physician corporation that provided occupational health services to HCH. Dr. Robert Marshall served as president of OOH while Bordenkircher was HCH's chief executive officer. Pursuant to an April 2006 agreement executed by Dr. Marshall and Bordenkircher (the "2006 Agreement"), OOH was responsible for recruiting and hiring a physician to provide occupational health services to HCH. The 2006 Agreement explicitly provided that "nothing in this Agreement is intended to create an employer-employee relationship * * *." (Docket No. 53, Exhibit "2," p. 2). However, it stated that the person recruited for the placement would "be joining * * * the HCH's medical staff * * *." (*Id*. at p. 4). Further, the 2006 Agreement allowed an HCH representative to be involved in the recruitment process and provided HCH "the right to request the removal of any * * * medical personnel provided." (*Id*.).

{¶4} Dr. Marshall subsequently recruited Dr. Bower, who executed a one-year employment agreement (the "Employment Agreement"). The Employment Agreement stated that "[t]he Employer [OOH] hereby employs the Employee [Dr.

Bower] and the Employee hereby accepts such employment with the Employer * * *." (Docket No. 2, Exhibit "A," p. 1). As part of this relationship, OOH agreed to place Dr. Bower in hospitals, businesses, and other health facilities to provide occupational health services. The Employment Agreement outlined that OOH was responsible for paying Dr. Bower's salary and providing her with certain enumerated employment benefits, such as vacation time, sick leave, and malpractice insurance. Additionally, it required Dr. Bower to "devote [her] full time, attention, and energy exclusively to the business of [OOH]" and "to devote [her] full time professional services [on] behalf of [OOH]." (*Id*. at p. 1, 15). After the execution of the Employment Agreement, OOH placed Dr. Bower with HCH's occupational health program, where she was responsible for providing health services not only at HCH but also at a variety of off-campus locations.

{¶5} In his deposition, Dr. Marshall discussed Dr. Bower's employment status under the Employment Agreement. He explicitly identified Dr. Bower as OOH's employee and said that she was never an employee of HCH. Further, Dr. Marshall often referred to HCH as "our customer," meaning his and Dr. Bower's, when discussing Dr. Bower's performance. (Docket No. 52, p. 86, 95, 117). Nevertheless, Dr. Marshall also indicated that Bordenkircher had to approve Dr. Bower's hiring before she was placed at HCH. As part of his deposition, Dr. Marshall also identified several documents. One was a letter from OOH's Human

Resources Manager to Dr. Bower that said "Welcome to [OOH]." (Docket No. 52, Exhibit "7"). Another was a pay stub issued by OOH to Dr. Bower showing its payment of her salary and the withholding of relevant taxes.

{¶6} Dr. Bower also discussed her employment status in her deposition. She admitted that OOH was responsible for terminating her, and identified the letter of termination that Dr. Marshall gave to her. The letter stated that "[d]ue to correspondence received from the administration at [HCH], the purpose of this correspondence is to provide you with written notice of termination of your employment with [OOH]." (Docket No. 51, Exhibit "I"). Despite this admission, Dr. Bower testified that she never knew the identity of her employer:

Q: At that time [during discussions with Dr. Marshall regarding her hiring], did [Dr. Marshall] explain to you that the employment relationship would be with [OOH]?

A: No. He said I had to meet Ms. Bordenkircher.

Q: When did you first come to realize that your employer would be [OOH]?

A: I never knew.

Q: Well, you signed an employment agreement with [OOH], right?

A: Yes, I had a contract.

Q: So at some point – well, maybe it was when you signed the contract you understood then that your employer would be [OOH]?

A: I was never clear on exactly for whom I worked. I asked and nobody told me. (Docket No. 51, p. 44-45).

**{¶7}** As to the responsibility for the decision to hire her, Dr. Bower testified as follows:

> Q:   So it's your belief that you were employed by [HCH]?
>
> A:   They had a say in my employment, yes.  I had to meet and be approved by Ms. Bordenkircher and that I was terminated based on her recommendation.  (*Id*. at p. 94).

Dr. Bower also testified that HCH did not "directly" pay her salary or benefits. (*Id*. at p. 52).

*The Circumstances of Dr. Bower's Removal*

**{¶8}** Dr. Bower's placement at HCH began in September 2006. Bordenkircher explained that that she decided to request the end of Dr. Bower's placement on the basis of 10 to 15 complaints regarding her "unprofessional behavior in general."   (Docket No. 53, p. 121).   These complaints of unprofessional behavior included reports that Dr. Bower had solicited a personal sample of prescription drugs from a company representative, was in the Maintenance Department as opposed to her assigned department on several occasions, and brought her daughter to the hospital on one occasion. Bordenkircher also discussed complaints made by other employees as to "uncomfortable conversations" with Dr. Bower.   (*Id*. at p. 143).   Further, Bordenkircher testified to a personal interaction with Dr. Bower in which Dr.

Bower discussed a patient's condition while the two were in the cafeteria line, which she considered a breach of confidentiality.

{¶9} After receiving these complaints, Bordenkircher contacted Dr. Marshall in an attempt to resolve the issues. She also had a meeting with Dr. Bower, which Bordenkircher described as follows:

> A: It would be my guess estimate that * * * I started off the conversation * * * that over a period of time numerous incidents had been reported to me regarding the drug rep, the daughter, the meetings in maintenance, people feeling uncomfortable with conversations Dr. Bower had in the cafeteria. There was a conversation Dr. Bower had with me in the cafeteria that made me uncomfortable and I shared all those episodes with Dr. Bower to indicate that whether or not they were true, they were people's perception of her behavior and that Henry County was a fairly conservative county and we're a very small hospital so things get around and that I wanted her to kind of do a check of her behavior and her approaches to things and make some changes so that we could positively influence people's perceptions regarding her in the building.
>
> Q: What did she say in response * * *?
>
> A: My memory has it that she was very defensive. She denied everything.
>
> Q: Okay.
>
> A: She indicated that people's perception was not that – not that their individual perceptions were not valid, but that reaction to people's perceptions was not indicated. Took no responsibility for behavior or performance and it was – it ended on a very hostile, negative note. (*Id*. at 143-44).

After providing this testimony, Bordenkircher identified the letter that she sent to Dr. Marshall in which she requested Dr. Bower's removal. The letter reads as follows:

> I am writing to request that Dr. Megan Bower be removed from HealthLink of Henry County Hospital effective April 2, 2007.
>
> As we have discussed, Dr. Bower has demonstrated unprofessional behavior, as indicated by her comments regarding "hiding out," spending break time in the maintenance department, and being perceived as flirtatious by several individuals. The issue was compounded during the meeting in which I shared my concerns with Dr. Bower. She accepted no responsibility for her behaviors or their affect [sic] on how others perceive her and HealthLink of Henry County Hospital.
>
> I have concerns that her lack of professionalism will negatively impact HealthLink. (Docket No. 53, Exhibit "3").

When pressed as to the meaning of "flirtatious," Bordenkircher testified that she did not consider the term to be stereotypic.

{¶10} Dr. Marshall's deposition also covered Dr. Bower's job performance during her placement at HCH. He indicated that he received complaints regarding Dr. Bower's tardiness to work, an incident in which she allegedly breached a sterile field while stitching a patient's wound, and an incident in which Dr. Bower said "s[---]." As a result of these complaints, Dr. Marshall had a meeting with Dr. Bower to make her "underst[and] that she represented not only herself, but [OOH] as well as Memorial Hospital and that sometimes in order to make things work well, we just have to remember that we're in a different environment and that we

have to do the best we can to make sure we represent everybody well." (Docket No. 52, p. 65).

**{¶11}** Dr. Marshall further described Bordenkircher's discussion of Dr. Bower's purportedly unprofessional behavior as follows:

> A: Mrs. Bordenkircher * * * described to me that Dr. Bower was – had some interest in a particular emergency room physician and that she made comment to staff, and I can't tell you specifically what staff that she had some interest in dating him and that she also felt that going down and having lunch with the maintenance people was not a typical action that physicians would do.
>
> Q: Is this part of the flirtation?
>
> A: Yes. (*Id.* at p. 76).

When describing what he understood flirtatious to mean, Dr. Marshall indicated that the term equally applied to men and women. Dr. Marshall also said that he learned from Bordenkircher that Dr. Bower had expressed romantic interest in an emergency department physician. According to Dr. Marshall, "[Bordenkircher] felt that [Ms. Bower's behavior] didn't represent a type of behavior she wanted in her hospital." (*Id.* at p. 80).

**{¶12}** Based on Bordenkircher's concerns, she asked Dr. Marshall for permission to meet with Dr. Bower without Dr. Marshall being present. Dr. Marshall indicated that he gave such permission and that after this meeting, he received the letter described above regarding the removal of Dr. Bower. After receiving the letter, Dr. Marshall indicated that he sought another placement for

Dr. Bower. However, he was unable to secure one. Because of this inability to secure an alternative placement and her removal from the HCH placement, Dr. Marshall decided to terminate Dr. Bower from her employment with OOH. Dr. Marshall subsequently replaced Dr. Bower at HCH with another female physician.

*Basis for Dr. Bower's Gender Discrimination Claim*

{¶13} Dr. Bower denied being flirtatious and unprofessional during her time at HCH. She indicated in her deposition that her termination resulted from Appellees' stereotypic views of women. Specifically, Dr. Bower testified that she was wrongfully fired on the basis of being "flirtatious," which she said was "a negative stereotype traditionally applied to women * * *." (Docket No. 51, p. 166).

{¶14} Dr. Bower further explained that she believed she was treated differently by Bordenkircher than other male doctors who were faced with similar complaints of unprofessional behavior. In doing so, she discussed the example of Dr. Sungurlu, an emergency department physician at HCH. She indicated that on one occasion, Dr. Sungurlu showed her graphic images on an HCH computer. Dr. Bower provided the following testimony as to the graphic images:

> Q: Without getting too graphic, what do you mean by "graphic images"?
>
> A: There were morbidly obese women in lingerie on the computer screen and he showed it to me. I mean, there were other nurses around. (*Id*. at p. 94).

Dr. Bower also discussed another male doctor at HCH, who "had requested that the attractive female physical therapists wear bikinis with HCH over the parts of the bikini" and who communicated his desire "to see the equivalent of mud wrestling * * * in the therapy pool between the attractive therapists." (*Id*. at p. 91). Both of these male doctors, according to Dr. Bower, received different treatment than she did.

{¶15} Bordenkircher's deposition likewise addressed how she handled previous complaints of unprofessional behavior. She acknowledged that despite the receipt of complaints regarding Dr. Bower, she did not engage in any additional investigation to corroborate the allegations contained in them. This lack of investigation was different from several previous incidents in which Bordenkircher requested the removal of male physicians that other physician corporations placed at HCH. Each of these previous incidents, and Bordenkircher's responses, are outlined below in turn.

{¶16} In regard to Dr. S.,[2] Bordenkircher discussed an accusation that he offered prescriptions to patients in return for sexual favors. Bordenkircher learned of the allegations by reading a newspaper article. To corroborate the allegations, she called the state medical board and the owner of the physician corporation that

---

[2] To protect the identities of these doctors, we have elected to use their initials as opposed to their full names.

placed Dr. S. at HCH. It was only after these phone calls that Bordenkircher requested Dr. S.'s removal.

{¶17} Bordenkircher also discussed the removal of Dr. C. as follows:

Q: Why did you request that Dr. [C.] be removed?

A: We got some complaints from two different physician extender schools, they were physician assistant programs, that students that were assigned to Henry County Hospital emergency room reported that Dr. [C.] disrobed and had them do detailed physical assessments.

Q: What type of exams?

A: Prostate exams and a complete head-to-toe physical. (Docket No. 53, p. 97).

After learning of these reports, Bordenkircher engaged in an investigation that included discussions with representatives from both physician assistant programs, the chairman of HCH's board of directors, and Dr. C. himself. After these discussions, Dr. C. was removed from his position.

{¶18} Bordenkircher further testified that two other doctors, whose names she could not remember, were similarly removed from their placements at HCH. Both had visited pornographic websites, including those depicting sexual assault, and had "provid[ed themselves] sexual release" during their time on the clock in the emergency department. (*Id*. at p. 108). In both instances, Bordenkircher instructed HCH's technology staff to recover the internet histories for the computers that the doctors used and she discussed the incidents with both the

offending doctors and the chairman of HCH's board of directors. Again, only after this investigation was complete did Bordenkircher request the doctors' removal from their placements.

*Appellees' Motion for Summary Judgment*

{¶19} On February 16, 2012, Appellees filed their motion for summary judgment on the grounds that they were not Bower's employer and that there was no genuine issue of material fact regarding the existence of discrimination. The trial court granted the motion for summary judgment on May 29, 2012 on the basis that there was no employer-employee relationship between Appellees and Dr. Bower. It did not address the issue of whether there was a genuine issue of material fact regarding Appellees' purported discriminatory actions. Consequently, the trial court dismissed Dr. Bower's gender discrimination claim against Appellees. On September 27, 2012, the parties filed a stipulated order of dismissal in which Dr. Bower dismissed her remaining claims against OOH with prejudice.

{¶20} Dr. Bower timely appealed this judgment, presenting the following assignment of error for our review.

*Assignment of Error*

**THE TRIAL COURT COMMITTED PREJUDICIAL AND REVERSIBLE ERROR WHEN IT GRANTED APPELLEE'S MOTION FOR SUMMARY JUDGMENT GIVEN THERE ARE GENUINE ISSUES OF FACTUAL DISPUTE IN THE**

**RECORD AND THE APPELLEES ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

**{¶21}** In her sole assignment of error, Dr. Bower argues that the trial court improperly granted summary judgment in favor of Appellees on her claim for gender discrimination. Since we agree with the trial court's finding that there was no employment relationship between Appellees and Dr. Bower, we disagree with Dr. Bower.

*Summary Judgment Standard*

**{¶22}** An appellate court reviews a summary judgment order de novo. *Hillyer v. State Farm Mut. Auto. Ins. Co.*, 131 Ohio App.3d 172, 175 (8th Dist. 1999). Accordingly, a reviewing court will not reverse an otherwise correct judgment merely because the lower court utilized different or erroneous reasons as the basis for its determination. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 148 Ohio App.3d 596, 2002-Ohio-3932, ¶ 25 (3d Dist.), citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 222 (1994). Summary judgment is appropriate when, looking at the evidence as a whole: (1) there is no genuine issue as to any material fact, and (2) the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In conducting this analysis the court must determine "that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, [the nonmoving] party being entitled to have the

-14-

evidence or stipulation construed most strongly in the [nonmoving] party's favor." *Id*. If any doubts exist, the issue must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-59 (1992).

**{¶23}** The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument. *Id*. at 292. The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings. *Id*.; Civ.R. 56(E).

### *R.C. 4112.02*

**{¶24}** Dr. Bower has brought her gender discrimination claim under R.C. 4112.02, which generally prohibits employers from discriminating against employees on the basis of a protected trait. The statute specifically provides, in pertinent part, as follows:

> It shall be an unlawful discriminatory practice:
>
> (A)  For any employer, because of the * * * sex * * * of any person, to discharge without cause * * * or to otherwise discriminate against the person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

(B) For an employment agency or personnel placement service, because of * * * sex * * * to do any of the following:

* * *

(2) Comply with a request from an employer for referral of applications for employment if the request directly or indirectly indicates that the employer fails to comply with the provisions of Sections 4112.01 to 4112.07 of the Revised Code.

Courts are instructed to construe R.C. 4112.02's protections "liberally for the accomplishment of its purposes." R.C. 4112.08; *accord Ohio Civ. Rights Comm. v. Lysyj*, 38 Ohio St.2d 217, 220 (1974) ("[C]ourts, upon review, are to construe [Chapter 4112] liberally in order to effectuate the legislative purpose and fundamental policy implicit in [its] enactment * * *."), superseded by statute on other grounds as stated in *Rice v. CertainTeed Corp.*, 84 Ohio St.3d 417 (1999).

{¶25} Under R.C. 4112.01(A)(1), a "person" is defined as "one or more individuals, partnerships, associations, organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and other organized groups of persons." The statute further defines the term as including "any owner, lessor, assignor, builder, manager, broker, salesperson, appraiser, agent, employee, lending institution, and the state and all political subdivisions, authorities, agencies, boards, and commissions of the state." *Id.* R.C. 4112.01(A)(2), meanwhile, defines "employer" as "the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting

directly or indirectly in the interest of an employer." An "employee," under the statute, means "any individual employed by any employer * * *." R.C. 4112.01(A)(3). Finally, R.C. 4112.01(A)(5) defines an "employment agency" as "any person regularly undertaking, with or without compensation, to procedure opportunities to work or to procure, recruit, refer, or place employees."

*Dr. Bower's Employment Status with Appellees*

**{¶26}** Dr. Bower phrases the issue presented in this matter as "whether OOH was merely an 'Employment Agency' as defined under R.C. 4112.01(A)(5) and HCH was actually where [Dr.] Bower was placed during her employment." Appellant's Br., p. 9. This is not the appropriate framing of the issue. Dr. Bower never alleged in her amended complaint or any of her pleadings that OOH was an employment agency. Instead, she specifically alleged that OOH was an employer and person under R.C. 4112.01(A)(1) and (2). (Docket No. 30, p. 2). As a result, Dr. Bower has waived the issue of whether OOH was an employment agency and whether she can recover under R.C. 4112.02(B). *See Marmet Drug Task Force v. Paz*, 3d Dist. No. 9-11-60, 2012-Ohio-4882, ¶ 42 ("It is well-established that an argument that is not advanced in the trial court is waived for the purposes of appeal."), citing *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, ¶ 34.

{¶27} Rather, the proper issue before us is whether Appellees and Dr. Bower had an employer-employee relationship that is covered by R.C. 4112.02(A). This issue can further be encapsulated as whether Dr. Bower is an independent contractor or Appellees' employee. This is the proper framing of the issue involved in this matter because it is well-settled that to prevail under R.C. 4112.02(A), a plaintiff must "establish that she is an employee [of the defendant]." *Koballa v. Twinsburg Youth Softball League*, 9th Dist. No. 23100, 2006-Ohio-4872, ¶ 21; *accord Bansal v. Mt. Carmel Health Sys.*, 10th Dist. No. 10AP-1207, 2011-Ohio-3827, ¶ 22 (finding that physician-plaintiff could not pursue a R.C. 4112.02(A) claim against defendant-hospital because he was not an employee of the hospital); *Warnsley v. Toledo Bd. of Edn.*, 6th Dist. No. L-10-1219, 2011-Ohio-3134, ¶ 47 ("Appellee is not appellant's employer * * * [so] the trial court did not err in granting appellee summary judgment on her R.C. 4112.02(A) claim."); *Cooper v. Jones*, 4th Dist. No. 05CA7, 2006-Ohio-1770, ¶ 31 ("No evidence exists that an employer-employee relationship existed between appellant and appellees * * *. Thus, R.C. Chapter 4112 does not apply."); *Berge v. Columbus Community Cable Access*, 136 Ohio App.3d 281, 299-301 (10th Dist. 1999) (finding that plaintiff could not pursue R.C. 4112.02(A) claim since he did not present evidence of an employment relationship with the defendant); *see also Perron v. Hood Industries, Inc.*, 6th Dist. No. L-06-1396, 2007-Ohio-4478, ¶ 42

("Because R.C. 4112.14(A) [anti-age discrimination statute with similar language to R.C. 4112.02(A)] refers to employment discrimination between an employer and an employee, we find that * * * an independent contractor * * * is not entitled to pursue a claim pursuant to this statute.").

{¶28} Status as an "employee" is largely dependent "upon the degree to which [the purported employee] is economically dependent upon the institution charged with discrimination." *Neff v. Civ. Air Patrol*, 916 F.Supp. 710, 712 (S.D. Ohio 1996).[3] Essentially, to determine whether a party is an employee or an independent contractor, we must resolve the central question of "who had the right to control the manner or means of doing the work[?]" *Bostic v. Connor*, 37 Ohio St.3d 144 (1988), paragraph one of the syllabus. This inquiry is fact-intensive and requires the consideration of a multitude of factors, none of which are dispositive by themselves. *Id*. at 146. According to the common law agency test, adopted by the United States Supreme Court and several Ohio courts, we should consider the following relevant factors in this analysis:

> (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill required to perform

---

[3] In her appellate brief, Dr. Bower generally criticizes Appellees' use of federal case law to support their position. However, we find no fault in the use of federal case law to guide our resolution of Dr. Bower's R.C. 4112.02 claim. *See Little Forest Med. Ctr. of Akron v. Ohio Civ. Rights Comm.*, 61 Ohio St.3d 607, 609-10 (1991) ("[F]ederal case law interpreting Title VII of the Civil Rights Act of 1964 * * * is generally applicable to cases involving alleged violations of R.C. Chapter 4112."); *Borad v. April Ents., Inc.*, 2d Dist. No. 25092, 2012-Ohio-5096, ¶ 10 (noting that R.C. 4112.02 "is similar to federal discrimination law"); *Miller v. Potash Corp. of Saskatchewan*, 3d Dist. No. 1-09-58, 2010-Ohio-4291, ¶ 16 ("In interpreting the Ohio anti-discrimination statutes, Ohio courts have consistently looked to federal cases interpreting federal civil rights * * * legislation, in addition to Ohio case law.").

the work; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party. *Perron* at ¶ 32, citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325, 112 S.Ct. 1344 (1992).

{¶29} Here, the trial court separately considered 10 of the factors listed by the Sixth District in *Perron* and concluded that Dr. Bower was not in an employer-employee relationship with Appellees. We find no error in the trial court's reasoned consideration of these factors and similarly conclude that Dr. Bower was not Appellees' employee. As a result, summary judgment was appropriately granted in Appellees' favor.

{¶30} Appellees had very little control over the manner in which Dr. Bower practiced medicine. Indeed, when complaints arose regarding Dr. Bower, Bordenkircher's first reaction was to inform Dr. Marshall and to get him involved in the management of Dr. Bower's behavior. Bordenkircher also felt compelled to ask for Dr. Marshall's permission to even discuss the complaints with Dr. Bower outside of his presence.

{¶31} The trial court properly pointed out that OOH paid Dr. Bower's salary, withheld her taxes, and provided her employment benefits, all of which

support a finding that Appellees were not Dr. Bower's employer. Moreover, Dr. Bower signed an employment contract that identified OOH, not Appellees, as her employer, and Dr. Marshall explicitly testified that OOH was Dr. Bower's employer. This identification was consistent with Dr. Marshall's testimony that Dr. Bower was not terminated from OOH until he was unable to find an alternative placement for her and Bordenkircher's testimony that she only requested Dr. Bower's removal from her placement at HCH.

{¶32} Dr. Bower attempts to overcome these factors by pointing to several facts suggesting that Appellees were her employer. Most notably, she identifies Bordenkircher's role in her placement and removal, HCH's requirement that Dr. Bower perform certain marketing services, and HCH's role in billing patients for Dr. Bower's services. We are unable to find that these facts create a genuine issue of material fact as to Dr. Bower's independent contractor status. Entities, such as HCH, often involve themselves in the selection of independent contractors and they are entitled to some degree of control over contractors' duties. *See, e.g.*, *Bookwalter v. Prescott*, 168 Ohio App.3d 262, 2006-Ohio-585, ¶ 36 (6th Dist.) (affirming grant of summary judgment since "[t]he fact that an entity 'hires' a driver does not preclude a finding of an independent-contractor status"); *Koch v. Lind*, 121 Ohio App.3d 43, 53 (10th Dist. 1997) (affirming grant of summary judgment on basis of finding that party was an independent contractor because

principal "did not exercise or retain the right to exercise any *significant* degree of control or direction"). Additionally, HCH's role in billing was set by the 2006 Agreement between OOH and HCH, which merely set the parameters for OOH's provision of an independent contractor to HCH's occupational health department. Further, the 2006 Agreement's plain terms indicate that it does not create an employer-employee relationship, so we are unable to give much weight to it in our inquiry.

{¶33} In light of the foregoing, we are unable to find that Dr. Bower had an employer-employee relationship with Appellees. Consequently, the trial court properly granted summary judgment in Appellees' favor.

{¶34} Accordingly, we overrule Dr. Bower's sole assignment of error.

{¶35} Having found no error prejudicial to Dr. Bower in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**