[Cite as *Ward v. Oakley*, 2013-Ohio-4762.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| ROBERT S. WARD, et al., | : | |
| | | CASE NO.   CA2013-03-031 |
| Plaintiffs-Appellants, | : | |
| | | O P I N I O N |
| | : | 10/28/2013 |
| - vs - | | |
| | : | |
| BRETT OAKLEY, et al., | : | |
| | | |
| Defendants-Appellees. | : | |


CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2011-11-4110


Brennan, Manna & Diamond, LLC, Christopher B. Congeni and Katherine R. Basch, 75 East Market Street, Akron, Ohio 44308, for plaintiffs-appellants

Jeffrey M. Silverstein & Associates, Jeffrey M. Silverstein and Jason P. Matthews, 627 South Edwin C. Moses Boulevard, Dayton, Ohio 45408, for defendants-appellees


**M. POWELL, J.**

{¶ 1} Plaintiff-appellant, Robert S. Ward ("Ward"), on behalf of his minor daughter, R.W., appeals a decision of the Butler County Common Pleas Court granting summary judgment in favor of defendants-appellees, Brett Oakley ("Oakley") and B.A.O. Productions, LLC (collectively, "appellees"), regarding claims of hostile work environment sexual harassment and intentional infliction of emotional distress.  For the reasons set forth below,

we affirm in part and reverse in part the judgment of the trial court.

## I. FACTS

{¶ 2}   For purposes of our review, we examine the evidence in the record, as well as the inferences to be drawn from the underlying facts contained in the evidence, in the light most favorable to Ward. *Four-O Corp. v. Mike's Trucking, Ltd.*, 12th Dist. Madison No. CA2007-01-002, 2007-Ohio-5628, ¶ 11, citing *Turner v. Turner,* 67 Ohio St.3d 337, 341, 1993-Ohio-176.

{¶ 3}   In the fall of 2011, R.W., a high school student, worked with Ward and her stepmother, Lori, at Land of Illusion, a haunted theme park owned and operated by appellees.  While at work, R.W. was under the supervision of several individuals including Oakley, who had final authority over all issues which arose at the park.

{¶ 4}   Ward's claims arose from conversations that allegedly occurred between R.W. and Oakley on Sunday, October 16, 2011, when R.W. was 16 years old and Oakley was 48 years old.  On that Sunday, R.W. arrived at Land of Illusion between 6:00 p.m. and 7:00 p.m. to work in the theme park's concession stand with her friend and coworker, T.D.  According to R.W.'s deposition testimony, Oakley entered the concession stand a short time after her arrival and "jokingly at first" brought up the subject of birth control.  Oakley told R.W. and T.D. they needed "to be with a guy that had a vasectomy" and "really needed to be on birth control."  Oakley offered to talk to Ward because Oakley "wanted [R.W.] to be safe about having sex."  Although R.W. felt Oakley was just "trying to help [her] out" and "trying to act like a friend" to Ward, the conversation made R.W. feel "awkward," "a little embarrassed," and "kind of confused."  After the conversation, Oakley left the concession stand and R.W. went to Land of Illusion's gift shop to use the restroom.  R.W. was then instructed by another supervisor to stay and work at the gift shop rather than return to the concession stand.

{¶ 5}   Approximately two minutes after R.W. began working by herself in the gift shop,

she was again approached by Oakley, who continued to discuss sex and birth control. According to R.W.:

> [Oakley] started—he continued with the conversation of the birth control. That's how he started with the conversation. And then he asked me if I'd ever had sex, and I said no. He said—he looked at me like I was lying. He said no, R.W., how many guys, and I said [Oakley,] I've never. And he said he didn't believe me, that I looked like the type of girl that would have already had sex. * * * [A]nd then he said that guys my age didn't know how to have real sex, that they weren't experienced enough as somebody his age. He asked me how far I was willing to go, and I said like I don't know. I've never—I don't know. He just said well, like—just guess an age. I was like I don't know, I don't know, I don't know, [Oakley]. He was just like well, my age, and I didn't say anything. I just kind of shook my head and put my head down. I didn't know what to say. I was in shock. I was just so surprised that he ever said that. I never dreamed he would have said that to me.
>
> * * *
>
> He said that there was this place out in Kentucky, that if I ever got a chance to like get out of the house just for a day, that I could call him up—I could call him up and he would take me to this place out in Kentucky that had a pool inside the hotel room, and he said he would give me the experience of a lifetime, that I would never forget, and just—he said I'll show you what real sex is like, guys your age don't know, because I could just tell he still didn't believe me when I said I never had sex.
>
> * * *
>
> He said like when I turned twenty-one—he mentioned something about when I turned twenty-one, that there's this place—he would take me to Las Vegas, but he said that I couldn't tell anybody because, first of all, it would ruin him and my dad's friendship. You know, he could lose—get divorced and lose his company.

{¶ 6} R.W. explained this second conversation took place over ten minutes while customers were in and out the gift shop. When a customer approached R.W. and Oakley, he would stop talking, but would continue when the customer walked away. R.W. stated the conversation was also occasionally interrupted by "calls" Oakley received over a headset he wore that allowed him to communicate with individuals in different areas of the theme park.

The conversation between R.W. and Oakley ceased when Oakley received a call over his headset and "ran out the door toward the Haunted Trail." R.W. explained she was "in shock" by what Oakley had said and "so scared" that Oakley would return to the gift shop. R.W. sent a text message to T.D. and stated she needed to talk after work. When R.W.'s shift ended around 11:30 p.m., she met with T.D. and recounted the conversation she had with Oakley in the gift shop, stating she never wanted to work at Land of Illusion again. R.W. then drove herself home and went straight to bed.

{¶ 7}   The following day, Monday, October 17, 2011, R.W. testified she "could not think straight" at school and continued to think about what Oakley had said to her. That evening, R.W. told Ward and her stepmother what Oakley had said to her on October 16, 2011, breaking down into tears during the conversation. Neither R.W. nor her parents ever returned to work at Land of Illusion.

{¶ 8}   Since October 16, 2011, R.W. testified she has attempted to come to terms with what happened, but that her encounter with Oakley is "always on [her] mind" and "forever will be." R.W. has had trouble sleeping and her grades in school fell for a short period of time. R.W.'s father and stepmother testified R.W. has become "distant from the family" and remains "visibly upset" when she talks about Oakley. As of her March 22, 2012 deposition, R.W. had not sought counseling or medical treatment due to her encounter with Oakley. R.W. further testified that she saw no need for counseling, that she was "just dealing with it" and had no recollection of ever discussing counseling with Ward or her stepmother.

{¶ 9}   Oakley admitted during his deposition that he discussed birth control with R.W. on October 16, 2011. Oakley explained, after he had heard rumors about R.W. being caught with a boy in her bed, he took it upon himself to ask R.W. whether she was practicing safe sex and whether she had discussed birth control with her parents. Oakley told R.W. that if she would not talk to her parents about birth control, he "would talk to them." Oakley testified

- 4 -

he also had a conversation with R.W. at Land of Illusion's gift shop, where he told her that Ward would "kill" Oakley if he knew Oakley had talked to R.W. about birth control. Oakley denies ever propositioning R.W. for sex or inviting her to a hotel in Kentucky or to Las Vegas, but admits he did mention a hotel in Kentucky in reference to his plans with his wife for Sweetest Day. At the end of their conversation in the gift shop, Oakley claims R.W. asked him to bring her a pretzel and drink from the concession stand, which he did.

{¶ 10} As a result of the encounter between R.W. and Oakley on October 16, 2011, Ward, individually and on behalf of R.W., filed suit against appellees for sexual harassment in violation of R.C. 4112.02 and for intentional infliction of emotional distress. Following discovery, appellees moved for summary judgment on June 29, 2012. On February 11, 2013, the trial court issued a decision granting appellees' motion for summary judgment. Although the trial court acknowledged that issues of fact existed as to whether R.W. was a Land of Illusion employee or independent contractor, it found that Ward's causes of action did not satisfy the legal threshold for claims of a hostile work environment, sexual harassment, or intentional infliction of emotional distress.[1]

{¶ 11} From the trial court's grant of summary judgment, Ward appeals, raising two assignments of error.

## II. ANALYSIS

{¶ 12} "Summary judgment is a procedural device used to terminate litigation when there are no issues in a case requiring a formal trial." *Bowman v. AK Steel Corp.*, 12th Dist. Butler No. CA2010-06-141, 2010-Ohio-6433, ¶ 13, citing *Forste v. Oakview Const., Inc.*, 12th Dist. Warren No. CA2009-05-054, 2009-Ohio-5516, ¶ 7. Summary judgment is proper when:

---

1. R.C. 4112.02 does not apply to hostile work environment harassment claims involving independent contractors. *Bower v. Henry Cty. Hosp.*, 3d Dist. Seneca No. 13-12-46, 2013-Ohio-2844, ¶ 27; *Berger Hosp. v. Ohio Civ. Rights Com'n*, 4th Dist. Pickaway No. 86 CA 7, 1987 WL 13493, *2 (June 26, 1987).

(1) no genuine issues of material fact remain to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence, which must be viewed in a light most favorable to the nonmoving party, that reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C); *Creech v. Brock & Assoc. Constr.*, 183 Ohio App.3d 711, 2009-Ohio-3930, ¶ 10 (12th Dist.).

{¶ 13} An issue of fact exists when the relevant factual allegations in the pleadings, affidavits, depositions, or interrogatories are in conflict. *Scott v. Kings Island Co.*, 12th Dist. Warren No. CA98-04-044, 1999 WL 74585, *2 (Feb. 16, 1999). In deciding whether there is a genuine issue of material fact, the evidence must be construed in the nonmoving party's favor. *Id.*, citing *Hannah v. Dayton Power & Light Co.*, 82 Ohio St.3d 482, 485 (1998). Further, "the inferences to be drawn from the underlying facts contained in the evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the party opposing the motion." *Hannah,* citing *Turner*, 67 Ohio St.3d at 341.

{¶ 14} The party requesting summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact as to the essential elements of the nonmoving party's claims. *Marcus v. Rusk Heating & Cooling, Inc.*, 12th Dist. Clermont No. CA2012-03-026, 2013-Ohio-528, ¶ 44, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Once a party moving for summary judgment has satisfied its initial burden, the nonmoving party has the reciprocal burden to set forth specific facts showing that genuine issues remain. *Id.*; Civ.R. 56(E). Summary judgment is proper if the party opposing the motion fails to set forth such facts. *Dresher* at 293.

{¶ 15} An appellate court must review a trial court's decision to grant or deny summary judgment de novo, without any deference to the trial court's judgment. *Bowman* at ¶ 13, citing *Bravard v. Curran*, 155 Ohio App.3d 713, 2004-Ohio-181, ¶ 9 (12th Dist.).

{¶ 16} Assignment of Error No. 1:

{¶ 17} THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANT BY GRANTING THE DEFENDANT[S]-APPELLEES' MOTION FOR SUMMARY JUDGMENT ON [WARD'S] SEXUAL HARASSMENT--HOSTILE WORK ENVIRONMENT CLAIM.

{¶ 18} In his first assignment of error, Ward contends the trial court improperly granted summary judgment in favor of appellees on Ward's sexual harassment claim made pursuant to R.C. 4112.02, as genuine issues of material fact remain regarding Oakley's inappropriate comments to R.W.

{¶ 19} R.C. 4112.02(A) makes it an unlawful discriminatory practice "[f]or any employer, because of the * * * sex * * * of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  R.C. 4112.02(A); *Bowers v. Hamilton City School Dist. Bd. of Educ.*, 12th Dist. Butler No. CA2001-07-160, 2002-Ohio-1343, 2002 WL 449499, *3; *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 175 (2000). The Ohio Supreme Court has recognized two types of sexual harassment claims stemming from R.C. 4112.02(A); namely, "quid pro quo" harassment, *i.e.*, harassment that is directly linked to the grant or denial of a tangible economic benefit, and "hostile environment" harassment, *i.e.*, harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment.  *Bowman*, 2010-Ohio-6433 at ¶ 16, citing *Hampel* at paragraph one of the syllabus.  "Federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112."  *Bowers* at *3.

{¶ 20} Ward contends R.W. was subjected to hostile work environment sexual harassment.  In order to establish a prima facie case of hostile work environment sexual

harassment, Ward must show:

> (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

*Hampel* at paragraph two of the syllabus; *Bowman* at ¶ 17.

{¶ 21} In construing the evidence in a light most favorable to Ward, we find reasonable minds could conclude that the first two elements necessary to establish a claim of hostile work environment sexual harassment under R.C. 4112.02 were satisfied, i.e., that the harassment was unwelcome and based on sex. In addition, we find, as the trial court did, that genuine issues of material fact remain as to whether R.W. was an employee of Land of Illusion. Therefore, the remaining issue is whether a trier of fact could conclude that Oakley's alleged sexually suggestive conversation with R.W. was sufficiently severe or pervasive to create a hostile work environment and alter the conditions of R.W.'s employment.

{¶ 22} To establish actionable harm based upon hostile work environment sexual harassment, "the conduct in question must (1) be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and (2) be subjectively perceived by the victim to be abusive." *E.E.O.C. v. R&R Ventures*, 244 F.3d 334, 339 (4th Cir.2001), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367 (1993); *Jordan v. Ohio Civ. Rights Comm.*, 173 Ohio App.3d 87, 2007-Ohio-3830, ¶ 20 (12th Dist.). In conducting the subjective inquiry, we need only look at the testimony of R.W. R.W. subjectively perceived the environment at Land of Illusion to be hostile, as she felt "shocked" and "scared" by Oakley's sexual advances, was reduced to tears when recounting Oakley's statements, and never returned to work after October 16, 2011. Therefore, we find genuine issues of material

fact exist with regard to the subjective component of the inquiry and shall proceed to consider the objective inquiry.

{¶ 23} In conducting the objective inquiry, courts should examine all of the circumstances including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely offensive; and (4) whether it unreasonably interferes with an employee's work performance." *R&R Ventures* at 339, citing *Harris* at 23. In order to determine whether the harassing conduct was sufficiently severe or pervasive, the trier of fact must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment. *Hampel*, 89 Ohio St.3d at 181, citing *Ellison v. Brady*, 924 F.2d 872, 878 (C.A.9. 1991) ("the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct"); and *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla.1991) ("greater severity in the impact of harassing behavior requires a lesser degree of pervasiveness in order to reach a level at which Title VII liability attaches"). The "ordinary tribulations of the work place, such as sporadic use of abusive language, gender-related jokes, and occasional teasing" will not constitute a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275 (1998); *Armaly v. City of Wapakoneta*, 3d Dist. Auglaize No. 2-05-45, 2006-Ohio-3629, ¶ 31.

{¶ 24} The trial court failed to view the totality of the circumstances in determining whether Oakley's conduct toward R.W. was severe or pervasive. The trial court questioned only whether Oakley's alleged conduct was frequent and physically threatening to R.W,

concluding that it was neither.[2] The trial court did not review whether Oakley's statements to R.W. were severe, humiliating, and/or unreasonably interfered with R.W.'s work performance. We find that reasonab0le minds could conclude that Oakley's conduct toward R.W. on October 16, 2011, while certainly not frequent or physically threatening, was still sufficiently severe to constitute hostile work environment sexual harassment under R.C. 4112.02.

{¶ 25} While "rare or isolated incidents of sexual harassment rarely rise to the level of pervasiveness required to create a hostile work environment," the harassment becomes actionable when it "reaches the point where it 'alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment.'" *Gliatta v. Tectum, Inc.*, 211 F.Supp.2d 992, 1001-02 (S.D.Ohio 2002), citing *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784 (6th Cir.2000), and *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399 (1986). "There is no 'magic number' of incidents required to establish a hostile environment. * * * [E]ven one act of harassment will suffice if it is egregious." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir.2000); *Gliatta* at 1002. Moreover, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" including "the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998 (1998), citing *Harris*, 510 U.S. at 21.

{¶ 26} According to the evidence presented by Ward, Oakley had two conversations

---

2. In its analysis, the trial court provided:

> Was the activity here frequent, having known Oakley for years, and having worked for a number of nights prior to the incident, Oakley allegedly had only two discriminatory conversations with R.W., one of which R.W. herself dismissed? Was there any threat to R.W. when the second, allegedly more disturbing, conversation took place where the public was walking in and out, Oakley was listening to, and responding to hails from the radio he carried with him, and after which R.W. continued to work until the end of her shift? The Court finds that a reasonable jury

with R.W. that were of a sexual nature. First, Oakley discussed R.W.'s use of birth control while in Land of Illusion's concession stand. Second, while at the theme park's gift shop, Oakley offered to take R.W. to a hotel in Kentucky to show her how to have "real sex" with a "man" and then promised to take R.W. to Las Vegas for her 21st birthday. Oakley then requested R.W.'s silence so his friendship with her parents and his relationship with his wife would not be affected.

{¶ 27} R.W. felt "awkward" and "a little embarrassed" about the birth control conversation, but admitted that she was not humiliated by the conversation and thought Oakley was just trying to help her as a family friend. This conversation alone was neither sufficiently severe nor pervasive to constitute a hostile work environment. But, within minutes, Oakley re-engaged R.W. in additional sexually suggestive conversation in the gift shop.

{¶ 28} R.W. was "shocked" and "scared" by Oakley's sexual advances during the encounter in the gift shop. After the gift shop conversation, R.W. broke down in tears when recounting the conversation to her friend, and stated she never wanted to work at Land of Illusion again. The next day, R.W. again broke down in tears when she informed her parents of Oakley's comments. Neither R.W. nor her parents ever returned to work at Land of Illusion, though the theme park would remain open another seven days that season.

{¶ 29} These two exchanges between R.W. and Oakley are so proximate in time as to constitute a single incident and, therefore, are not pervasive. However, the lack of multiple incidents must be balanced against the objective severity of Oakley's alleged conduct. Here, viewing the evidence in a light most favorable to Ward, a 16-year-old girl was subjected to a thinly veiled solicitation for sex by a long-time, close family friend who was 32 years her

could only answer the questions in the negative, even considering the fact most strongly in favor of [Ward].

senior. *See R&R Ventures*, 244 F.3d at 340 (discussing the creation of a hostile work environment based upon the conduct of "an adult male in a supervisory position over young women barely half his age"). Additionally, Oakley, as owner of Land of Illusion, had the ultimate authority over R.W. and her parents, whether they be employees or independent contractors. Furthermore, Oakley impressed upon R.W. the need to stay silent in order to protect his relationship with her parents and his own wife. Oakley admitted to stating that Ward would "kill him" if Ward knew Oakley had spoken to R.W. about birth control. As Oakley was the owner of the company, there was no one for R.W. to turn to for redress. Oakley placed R.W. in the untenable position of choosing between continued exposure to Oakley or jeopardizing her employment at Land of Illusion and that of Ward and her stepmother. This conduct eclipses the threshold of severity required to defeat summary judgment.

{¶ 30} We find, viewing the evidence in the light most favorable to Ward, that genuine issues of material fact remain as to whether these conversations between Oakley and R.W. created a hostile work environment based upon sexual harassment. *See Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 724 (10th Dist.1999) ("Whether a work environment is a hostile environment is a question of fact"). The trial court erred in granting summary judgment in favor of appellees on Ward's R.C. 4112.02 claim.

{¶ 31} Accordingly, Ward's first assignment of error is sustained.

{¶ 32} Assignment of Error No. 2:

{¶ 33} THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANT BY GRANTING THE [APPELLEES'] MOTION FOR SUMMARY JUDGMENT ON [WARD'S] INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.

{¶ 34} In his second assignment of error, Ward claims the conduct his daughter was subjected to was so severe, pervasive, and offensive that he is entitled to recover for

intentional infliction of emotional distress and the trial court erred in dismissing this claim on summary judgment.

{¶ 35} In order to survive summary judgment on his claim of intentional infliction of emotional distress, Ward was required to show: (1) Oakley either intended to cause emotional distress or knew or should have known the actions taken would result in serious emotional distress to R.W.; (2) Oakley's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) Oakley's actions were the proximate cause of R.W.'s psychic injury, and (4) the mental anguish suffered by R.W. is serious and of a nature that no reasonable person could be expected to endure it. *See Curry v. Blanchester*, 12th Dist. Clinton Nos. CA2009-08-010 and CA2009-08-012, 2010-Ohio-3368, ¶ 52; *Burkes v. Stidham*, 107 Ohio App.3d 363, 375 (8th Dist.1995).

{¶ 36} In the case before us, the trial court found that Ward failed to prove the mental anguish suffered by R.W. was serious and of a nature that no reasonable person could be expected to endure it. As we find this issue dispositive of Ward's intentional infliction of emotional distress claim, we shall begin our analysis here.

{¶ 37} In order to constitute serious emotional distress, "the injury that is suffered must surpass upset or hurt feelings, and must be such that 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances in the case.'" *Radcliff v. Steel Elec., Inc.*, 164 Ohio App.3d 161, 2005-Ohio-5503, ¶ 42 (9th Dist.), citing *McPherson v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21499, 2003-Ohio-7190, ¶ 35. A court must determine whether a plaintiff has stated a cause of action for intentional infliction of emotional distress "by ruling whether the emotional injury alleged is 'serious' as a matter of law." *Winkle v. Zettler Funeral Homes, Inc.*, 182 Ohio App.3d 195, 2009-Ohio-1724, ¶ 34 (12th Dist.). The "seriousness" of the emotional distress

is "decided on a case-by-case basis" and must be "more than trifling, mere upset, or hurt feelings." *Id.* at ¶ 34-35, citing *Paugh v. Hanks*, 6 Ohio St.3d 72, 78 (1983).

**{¶ 38}** The person claiming serious emotional distress must present some "guarantee of genuineness" in support of his or her claim to prevent summary judgment. *Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, 2002-Ohio-443, ¶ 15 (10th Dist.), citing *Paugh* at 76. This is in contrast with what is necessary in a cause of action claiming emotional distress as merely an element of damages arising from a separate tortious injury. In such cases, the emotional distress need not satisfy the "severe and debilitating" standard. *See Binns v. Fredendall*, 32 Ohio St.3d 244 (1987), paragraph one of the syllabus. Here, the injury upon which the action is based is the alleged emotional distress from which all other claimed damages arise. Because psychic injuries are much more easily feigned than are physical and economic injuries, a more arduous standard applies.

**{¶ 39}** In most instances, a plaintiff can supply this genuineness with expert medical testimony. *Id.*, citing *Schultz v. Barberton Glass Co.*, 4 Ohio St.3d 131, 135 (1983). Such testimony, however, is not always necessary. *Id.* at ¶ 16. In lieu of expert testimony, a plaintiff may submit testimony of lay witnesses who "testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff." *Paugh* at 80; *Buckman-Peirson v. Brannon*, 159 Ohio App.3d 12, 2004-Ohio-6074, ¶ 57 (2d Dist.). "A court may decide whether the emotional injury alleged constitutes 'serious emotional distress' as a matter of law." *Ford Motor Credit Co. v. Ryan*, 189 Ohio App.3d 560, 2010-Ohio-4601, ¶ 57 (10th Dist.), citing *Buckman-Peirson* at ¶ 41.

**{¶ 40}** In the case at hand, R.W. does not present any medical testimony relating to her mental anguish from the events of October 16, 2011. During their March 2012 depositions, R.W. and her parents testified R.W. had a temporary drop in her school grades and had become more distant and detached from her family and friends. Ward testified R.W.

cried when she initially told him about her encounter with Oakley and had cried the night before giving her deposition, but had not been brought to tears other than those occasions and was not seeking counseling. R.W. testified she had not sought counseling or any form of treatment for her distress, stating that she was "just dealing with it" and saw no need for treatment. R.W.'s stepmother also testified that, though she had thought about discussing counseling with R.W., the family had never sought counseling for R.W. However, in his affidavit submitted in opposition to appellees' motion for summary judgment in July 2012, Ward averred R.W. was seeking counseling. The affidavit did not specify when such counseling began or the frequency or duration of the counseling.

{¶ 41} After a thorough review of the record, we find there is no evidence to suggest R.W. suffered the *serious* emotional distress necessary to constitute an actionable claim for intentional infliction of emotional distress. *Paugh* at 78 ("By the term serious, we of course go beyond trifling mental disturbance, mere upset or hurt feelings. We believe that serious emotional distress describes emotional injury which is both severe and debilitating"). Though the testimony of R.W. and her parents shows she was upset about what occurred between herself and Oakley, there is no evidence her emotional distress was so serious and of a nature that no reasonable person could be expected to endure it. R.W.'s testimony that she was "just dealing with it" supports the conclusion that a reasonable person could be expected to endure Oakley's conduct and, in fact, that R.W. was enduring it. Moreover, the fact that R.W. did not seek counseling until after the issue was raised in her March 2012 deposition is reflective of her lack of serious emotional distress. Although testimony from a mental health professional is not required to prove serious emotional distress, the lack of such testimony is critical in this case.

{¶ 42} For the foregoing reasons, we find Ward has failed to prove his claim of intentional infliction of emotional distress and, therefore, the trial court did not err in granting

summary judgment in favor of Oakley.

{¶ 43} Accordingly, Ward's second assignment of error is overruled.

### III. CONCLUSION

{¶ 44} For the reasons set forth above, the judgment of the trial court is hereby affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

RINGLAND, P.J., and PIPER, J., concur.