[Cite as *Ellis v. Jungle Jim's Market, Inc.*, 2015-Ohio-4226.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| DANA ELLIS, | : | |
| Plaintiff-Appellant, | : | CASE NO. CA2014-12-254 |
| | : | O P I N I O N |
| - vs - | | 10/13/2015 |
| | : | |
| JUNGLE JIM'S MARKET, INC., et al., | : | |
| Defendants-Appellees. | : | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2013-11-3254

Kimberly C. Young, Ryan M. Harrell, 6105 Parkland Blvd., Suite 200, Mayfield Heights, Ohio 44124, for plaintiff-appellant

Croskery Law Offices, Robert F. Croskery, 810 Sycamore Street, 2nd Floor, Cincinnati, Ohio 45202, for defendant-appellee, Jungle Jim's Market, Inc.

Croskery Law Offices, Alexander J. Durst, 810 Sycamore Street, 2nd Floor, Cincinnati, Ohio 45202, for defendant-appellee, Juliano Caldas

**HENDRICKSON, J.**

{¶ 1} Plaintiff-appellant, Dana Ellis, appeals from a decision of the Butler County Court of Common Pleas granting summary judgment to defendants-appellees, Juliano Caldas and Jungle Jim's Market, Inc. d.b.a. Jungle Jim's International Market, on her claims

of sexual harassment and retaliation.[1]  For the reasons set forth below we reverse and remand the matter to the trial court for further proceedings.

## FACTUAL BACKGROUND

{¶ 2}  In October 2012, Ellis began working for Jungle Jim's, a supermarket located in Fairfield, Ohio.  Ellis was initially employed as a bagger, making $8 an hour.  In this position, her responsibilities included bagging groceries for customers, helping customers, cleaning, and doing "take-backs" of items to their assigned departments when the items were not purchased by customers.  At the time Ellis was hired, she received a copy of Jungle Jim's Employee Handbook and a copy of the store's Sexual Harassment Policy.  This policy stated in relevant part that

> sexual harassment is a sexual attention that is unwelcome and unwanted, e.g., when someone is treated in a way that he or she doesn't like.  * * *
>
> * * *
>
> Jungle Jim's has taken steps to prevent and respond to incidents of sexual harassment.  Our policy is stated on page 24 of the handbook.  Complaints will be handled fairly and the process applies to all workers, men and women, employees, supervisors and management equally.  Employees' privacy will be protected to the extent possible while complaints are investigated and actions are taken.
>
> **What You Can Do!**
> If you are the target of unwanted sexual attention or behavior, respond to the problem by making your feelings absolutely clear.  Sometimes people don't realize that they're being offensive!  Record the times, places and specifics of each incident with your reactions.  Report continuing harassment according to our company policies.  If your harasser is your manager, go to the person responsible for your manager's actions or if you would feel more comfortable, we are appointing Norma Sarosy to head up a committee to investigate all sexual complaints, so you may talk with her about situations of this nature.

---

1.  At times, the parties' spelled Juliano Caldas' last name as "Caldes."  For consistency, we shall at all times refer to defendant-appellee, Juliano Caldas, as "Caldas."

**Your Part at Jungle Jim's!**
Make sure you're not involved in any forms of "inappropriate behavior."  \* \* \* Please remember: If you're offended, don't hesitate to make that clear to the harasser and to your manager. Understand sexual harassment, what it is, and how it affects people and your working environment.  Respond immediately if you are a victim of sexual harassment or you know someone who is.

Ellis signed a paper acknowledging receipt of the sexual harassment policy on October 9, 2012.

{¶ 3}   In early February 2013, Ellis was transferred to the store's seafood department, where she began working as a "fish clerk" under the supervision of Caldas, the department's manager.  Ellis received a $1 per hour pay raise, and her primary responsibilities in this new position included cleaning, filleting, and selling fish, helping customers, and keeping the department clean.  About a month after being transferred to the seafood department, Ellis claimed Caldas began subjecting her to "unwelcome inappropriate sexual comments, questions, innuendo[s] and suggestions on a near daily basis."  According to Ellis' deposition testimony, beginning March 4, 2013, Caldas started to discuss his penis around her and asked what positions she likes to have sex in, if she liked oral sex, and if she swallowed.  He also asked her what she knew about a split tongue, which he later explained had nothing to do with a snake as Ellis thought, but rather "it's when a guy has a split tongue, so they can lick a woman in both spots at the same time."  Caldas told Ellis he wanted to "bend [her] over and BF" her, and he would stick his tongue out at her and simulate licking.  Ellis also claimed that on one occasion, Caldas unzipped his pants, stuck his hand through his zipper, and asked her to look at his penis.  On another occasion, she stated Caldas inappropriately rubbed her leg and when she moved her leg and told him to get away from her, he asked her if she and another employee "were fucking in the cooler?"  Ellis testified she believed her fellow co-workers, including Mark Likoy, James Pease, Virginia Rowland, and Alex Gleason,

had seen or heard Caldas' inappropriate actions and remarks.

{¶ 4} Ellis claimed Caldas subjected her to inappropriate sexual remarks nearly every day and she regularly told him to stop his behavior and that his conduct was unwelcome. Ellis claimed Caldas' actions made it more difficult to work at Jungle Jim's and caused her emotional distress. She stated she began suffering from anxiety and nervousness, lost weight, and became physically ill as a result of his actions, often throwing up at work and at home. Nevertheless, Ellis did not personally report Caldas' behavior to any members of Jungle Jim's management because she felt Caldas had threatened her job when he "put his hand on [her] shoulder and * * * said, 'I am just kidding, you know you like your job.'"

{¶ 5} Eventually, on May 3, 2013, another seafood employee, Likoy, reported to Travis King, the assistant store manager, that he found Ellis crying and saying that she felt like she was being sexually harassed by Caldas. King sent an email concerning this allegation to the store manager, Kathy Dick, who had been placed in charge of investigating the store's sexual harassment complaints.[2] The next morning, May 4, 2013, Dick began looking into the matter. Dick and King met with Ellis, who advised them that Caldas was indeed making sexual comments to her which she found offensive. Ellis provided Dick with the following written statement:

> [Caldas] has made volgur [sic] statements to me. Such as licking of body parts, talking about his penis, making embarrassing statements about my facial hair, talking about a split tongue how it can lick on both parts of my body and would I like that done. Things get said everyday in front of people [and] its degrading and not appropriate. I have had a lot of people say to me that he should not speak like this and I have asked him to stop. It has not.

---

2. Although the sexual harassment policy signed by Ellis on October 9, 2012, advised that Norma Sarosy would "head up a committee to investigate all sexual complaints," Dick testified Sarosy had died in February 2012. In her deposition testimony, Dick acknowledged the sexual harassment policy had not been updated to reflect that she was in charge of handling all sexual harassment complaints.

Ellis was advised by Dick that the issue would be addressed with Caldas and she should let Dick know if Caldas' behavior continued or if he said something that made her feel uncomfortable. Dick also offered to move Ellis out of the seafood department, but Ellis asked to remain in the department because Ellis felt like she was learning a skill there and she liked her job.

{¶ 6} Following their conversation with Ellis, Dick and King spoke with Caldas about Ellis' allegations. Caldas denied making any inappropriate comments to Ellis or engaging in inappropriate behavior. Caldas was given a verbal warning and informed that the behavior described by Ellis was inappropriate and would not be tolerated in the future. According to an Incident Report written by Dick, Caldas assured Dick and King "that it would not happen again." Then, the next day, May 5, 2013, Caldas was written up in an "Employee Counseling Report." This document was created by Dick and signed by both her and Caldas. The document states the following:

> **Describe the action and impact on job and/or company:**
> On 5/4/13 I had a conversation with Dana [Ellis], a female employee in seafood. Dana stated that Juliano [Caldas] was making vulgar and sexual remarks to and in front of her. Dana stated that they made her feel uncomfortable and degraded.
>
> Juliano – this is sexual harassment!
>
> **Describe expected improvement and/or standards for the future:**
> Juliano is not to say anything sexual in nature to Dana or any other employee.
>
> **Next action if employee does not meet the improvement/standards required:**
> IF incident occurs again – Termination.
>
> Sexual harassment will Not Be TOLERATED!!

{¶ 7} When deposed, Dick testified that in addition to talking to Ellis and Caldas, she had investigated Ellis' complaints by speaking with other employees who either currently

worked or had worked in the seafood department with Caldas and Ellis. Dick specifically claimed she spoke with Virginia Rowland and Jamie Michal shortly after Ellis disclosed Caldas' actions on May 4, 2013. Neither woman corroborated Ellis' allegations nor indicated Caldas' behavior was inappropriate towards them or others. Dick did not, however, speak with Likoy, the individual who originally brought the allegations to light, as she did not believe him to be credible based on his past actions of leaving drunken voicemails on her work phone. Dick also did not obtain written statements from members of the seafood department, including Rowland or Michal, until around June 5, 2013. Regarding the timing of her investigation, deposition testimony from Rowland and Michal appeared to contradict Dick's testimony. Both Rowland and Michal indicated that the first time they were approached by Dick about Caldas' behavior was when they gave their written statements in June 2013.

{¶ 8} In any event, Ellis continued to work in the seafood department after making her May 4, 2013 complaint. Her hours were changed, however, so that she and Caldas did not work together alone in the department.[3] In her deposition testimony, Ellis gave conflicting testimony about Caldas' behavior in the seafood department after May 4, 2013. At one point, she testified he continued to speak to her in "foul language." At another point, she testified he no longer made comments to her, but he would whisper to other employees and smile at her "murkily." She stated she did not tell Dick about Caldas' continued behavior, but claimed she once told King that Caldas had continued to make inappropriate comments when King walked through the seafood department. Ellis also claimed that after she complained about Caldas' actions, she was denied a request to take a weekend off in order to attend her grandson's graduation and Caldas intentionally waited too long to give her a paper that would

---

3. Ellis' start time was changed from 6:00 a.m. to 8:00 a.m.

allow her to enroll in Jungle Jim's 401(k) benefit plan. Ellis admitted, however, that she did not discuss her denied request for time-off with Dick, King, or anyone in upper management, and she further admitted that Dick offered her the opportunity to enroll in the 401(k) plan after the program's enrollment deadline had passed.

{¶ 9} In their deposition testimony, Dick and King both testified that after receiving Ellis' initial complaint on May 4, 2013, they began to walk through the seafood department periodically to check on Ellis. Both Dick and King testified they spoke with Ellis multiple times each week, and Ellis never complained about Caldas' behavior after May 4, 2013. Ellis also never approached them outside of the seafood department to complain about Caldas' behavior.

{¶ 10} On May 28, 2013, Ellis filed a complaint against Jungle Jim's with the Ohio Civil Rights Commission (OCRC), alleging she was being sexually harassed. Jungle Jim's eventually became aware of this filing. On June 5, 2013, Dick and King met with Ellis. They informed Ellis she was being transferred out of the seafood department and back to her position as a bagger. The number of hours she worked and her pay rate remained the same.

{¶ 11} After she was transferred back to her bagging position, Ellis met with the store's owner, James Bonaminio. Bonaminio asked Ellis whether she wanted to be moved back to the seafood department, and she said "no." Additionally, sometime after Ellis was moved back to her bagging position, Likoy telephoned King to inform King that he knew of two people who saw Caldas rubbing Ellis' leg on one occasion. Likoy identified these two men as Charles Walters and Mark Segrist, both employees in the seafood department. It is unclear from the record whether King or Dick followed up with these employees about Likoy's claim.

{¶ 12} Shortly after Ellis filed her complaint with the OCRC, Ellis stepped into an uncovered drain at Jungle Jim's and twisted her knee. Pursuant to her doctor's order, Ellis was restricted to a sitting job. Jungle Jim's transferred her to a store greeter position, where

she was able to remain seated while greeting customers. Ellis had no loss of hours or pay in this position. Despite acknowledging that the greeter position was the only light duty job in the store, Ellis testified she felt Jungle Jim's put her in that position to ridicule her. On July 27, 2013, while acting as a store greeter, Ellis told a coworker she "couldn't take it anymore" and she walked off the job. Ellis never returned to Jungle Jim's.

{¶ 13} Months later, after Ellis commenced her lawsuit against Jungle Jim's, Dick and King met with James Pease, an employee of the seafood department who had worked with both Caldas and Ellis. King testified she asked to meet with Pease on May 1, 2014, after realizing "he was one [she] must not have spoke[n] with" originally. During this meeting, Pease indicated he felt Ellis had been "verbally" sexually harassed by Caldas. According to Pease's deposition testimony, Caldas would talk about penises or ask people about their sex lives "pretty daily." Although Pease stated he had been present when Caldas made sexually-related comments that he felt were inappropriate for a store manager to make, the reason he did not report them to management was because "[f]or him personally, it wasn't that big of deal." Pease also stated that even after Ellis left the seafood department and King spoke with Caldas about his behavior, Caldas continued to make inappropriate comments. King testified her conversation with Pease in May 2014 was the "first time that somebody told me that they felt that it was improper anything that [Caldas] had said. Up until that point I had gotten all - - you know, like nobody had said anything bad about [Caldas] or anything up until that point."

**PROCEDURAL BACKGROUND**

{¶ 14} In November 2013, Ellis filed a complaint against Caldas and Jungle Jim's for hostile work environment sexual harassment and intentional infliction of emotion distress. Ellis also set forth a claim that Jungle Jim's unlawfully retaliated against her by changing the terms and conditions of her employment after she filed a charge of sexual harassment with

the OCRC. The parties engaged in discovery, and Ellis, Caldas, Dick, King, Rowland, Michal, and Brenda Brinson, a former seafood clerk at Jungle Jim's, were deposed. Following the filing of these depositions, Jungle Jim's and Caldas, respectively, filed motions for summary judgment on all of Ellis' claims. The trial court entered judgment in their favor as to all counts. Ellis timely appealed, challenging the trial court's decision to award summary judgment to Caldas' on her claim of sexual harassment and to Jungle Jim's on her claims of sexual harassment and retaliation.

## STANDARD OF REVIEW

{¶ 15} "Summary judgment is a procedural device used to terminate litigation when there are no issues in a case requiring a formal trial." *Bowman v. AK Steel Corp.*, 12th Dist. Butler No. CA2010-06-141, 2010-Ohio-6433, ¶ 13. This court's review of a summary judgment decision is de novo. *Grizinski v. Am. Express Fin. Advisors, Inc.*, 187 Ohio App.3d 393, 2010-Ohio-1945, ¶ 14 (12th Dist.). "De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Morris v. Dobbins Nursing Home*, 12th Dist. Clermont No. CA2010-12-102, 2011-Ohio-3014, ¶ 14. Summary judgment is appropriate when there are no genuine issues of material fact to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C); *Williams v. McFarland Properties, L.L.C.*, 177 Ohio App.3d 490, 2008-Ohio-3594, ¶ 7 (12th Dist.).

{¶ 16} To prevail on a motion for summary judgment, the moving party must be able to point to evidentiary materials that show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). "If the moving party fails to satisfy its initial burden, the motion for

summary judgment must be denied." *Id.* However, if the moving party meets its burden, then the burden shifts to the nonmoving party to present evidence demonstrating that some issue of material fact remains to be resolved. *Id.* "A material fact is one which would affect the outcome of the suit under the applicable substantive law." *Bowman*, 2010-Ohio-6433 at ¶ 14. In deciding whether a genuine issue of material fact exits, "[a]ll evidence submitted in connection with a motion for summary judgment must be construed most strongly in favor of the party against whom the motion is made." *Dobbins Nursing Home* at ¶ 15, citing *Morris v. First Natl. Bank & Trust Co.*, 21 Ohio St.2d 25, 28 (1970).

### SEXUAL HARASSMENT CLAIM

{¶ 17} Assignment of Error No. 1:

{¶ 18} THE TRIAL COURT ERRED IN GRANTING DEFENDANT JULIANO CALD[A]S' MOTION FOR SUMMARY JUDGMENT FINDING NO GENUINE ISSUE OF MATERIAL FACT THAT HIS ACTIONS CREATED A HOSTILE WORK ENVIRONMENT.

{¶ 19} In her first assignment of error, Ellis contends that summary judgment was erroneously entered in Caldas' favor on her claim of hostile work environment sexual harassment as genuine issues of material fact remain regarding whether Caldas' harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of her employment.

{¶ 20} R.C. 4112.02(A) makes it an unlawful discriminatory practice "[f]or any employer, because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." The Ohio Supreme Court has recognized two types of sexual harassment claims stemming from R.C. 4112.02(A); namely, "quid pro quo" harassment, i.e., harassment that is directly linked to the grant or denial of a tangible economic benefit, and "hostile

environment" harassment, i.e., harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169 (2000), paragraph one of the syllabus. "Federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Bowers v. Hamilton City School Dist. Bd. of Educ.*, 12th Dist. Butler No. CA2001-07-160, 2002 WL 449499, * 3 (Mar. 25, 2002), citing *Hampel* at 175.

{¶ 21} Here, Ellis asserted she was subjected to hostile work environment sexual harassment. To establish a prima facie case of hostile work environment sexual harassment, Ellis must demonstrate:

> that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

*Hampel* at paragraph two of the syllabus; *Ward v. Oakley*, 12th Dist. Butler No. CA2013-03-031, 2013-Ohio-4762, ¶ 20.

{¶ 22} In construing the evidence in a light most favorable to Ellis, we find reasonable minds could conclude that the first, second, and fourth elements necessary to establish a claim of hostile work environment sexual harassment under R.C. 4112.02 were satisfied. Both Ellis and Caldas testified Caldas' served as the manager of the seafood department. According to Caldas, in this role he supervised and directed the daily activities of Ellis and approximately nine to eleven other seafood department employees. Ellis testified that about a month after she was transferred into the seafood department, Caldas began making inappropriate sexual comments and gestures towards her on a daily basis and he continued

- 11 -

his actions even after she told him his conduct was inappropriate and needed to stop. According to Ellis, Caldas discussed his penis with her, asked her about her sexual habits and preferences, commented that he wanted to "bend [her] over and BF" her, and he would stick his tongue out at her and simulate licking. The foregoing evidence is sufficient to establish the harassment was unwelcome, was based on sex, and was committed by a supervisor.

{¶ 23} Whether Ellis can prove the remaining element, that the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of her employment, is vigorously contested by the parties. "To establish actionable harm based on hostile work environment sexual harassment, 'the conduct in question must (1) be severe or pervasive enough to create an objectively hostile or abusive work environment, and (2) be subjectively perceived by the victim to be abusive.'" *Ward*, 2013-Ohio-4762 at ¶ 22, quoting *E.E.O.C. v. R & R Ventures*, 244 F.3d 334, 339 (4th Cir.2001). *See also Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 723 (10th Dist.1999); *Thornton v. Federal Express Corp.*, 530 F.3d 451, 455 (6th Cir.2008). In determining whether an environment is hostile or abusive, a court must "view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment." *Hampel*, 89 Ohio St.3d at 169, paragraph five of the syllabus. Courts may therefore consider the frequency of the discriminatory conduct, its severity, whether the conduct is physically threatening or humiliating, or is merely an offensive utterance, and whether it unreasonably interferes with the victim's work performance. *Hampel* at 180; *Jordan v. Ohio Civ. Rights Comm.*, 173 Ohio App.3d 87, 2007-Ohio-3830, ¶ 20 (12th Dist.), citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367 (1993). With respect to whether the conduct has interfered with the victim's work performance, a plaintiff-victim "need not prove a tangible decline in her work productivity; only

'that the harassment made it more difficult to do the job.'" *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir.2009), quoting *Williams v. General Motors*, 187 F.3d 553, 567 (6th Cir.1999).

{¶ 24} The trial court found that reasonable minds could conclude that Caldas' conduct was sufficient to satisfy the "severe or pervasive" portion of the third element, but that there was "simply * * * no evidence in the record that the behavior about which Ellis complains affected the 'terms, conditions, or privileges of her employment.'" Specifically, the trial court found that "Ellis neither testified that Caldas' behavior made it more difficult to do her job nor presented any other evidence of how i[t] might have unreasonably interfered with her work performance." We disagree with the trial court's conclusions and find that when viewing the record in the light most favorable to Ellis, she has presented evidence creating a genuine issue of material fact as to whether Caldas' conduct was sufficiently severe and pervasive to affect the terms and conditions of her employment.

{¶ 25} Ellis presented evidence that an objectively hostile work environment existed and that she subjectively perceived the environment to be abusive. She produced evidence that would allow a finder of fact to conclude that Caldas' continuous preoccupation with sex talk and his unwelcome advances was objectively severe, degrading, offensive, and humiliating and resulted in an abusive and hostile work environment. *See, e.g., Thornton*, 530 F.3d at 456. "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" including "the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998 (1998), citing *Harris*, 510 U.S. at 23. Here, Ellis presented evidence Caldas' improper conduct occurred daily and was often in front of and overheard by her coworkers. She described multiple instances where Caldas made references to his penis, asked her

about her sexual preferences, and discussed oral sex and split tongues with her. She also described instances where Caldas told her he wanted to "bend [her] over and BF" her and he stuck his tongue out at her to simulate licking. While both Pease and Michal stated they were never personally offended by Caldas' comments, both admitted to overhearing Caldas discussing his and other people's penises.[4] Pease also stated Caldas' improper behavior occurred "pretty daily" and he believed Caldas' had verbally sexually harassed Ellis. Considering the totality of the circumstances described in Pease's and Ellis' deposition testimony, there is sufficient evidence for a reasonable person to find the seafood department—permeated with vulgar language, demeaning conversations, and inappropriate sexualized gestures—objectively hostile.

{¶ 26} Ellis also presented evidence that she subjectively perceived the environment created by Caldas to be abusive. Ellis described offensive behavior and comments that Caldas engaged in almost daily over a period of several months. Ellis stated Caldas' offensive behavior "made it more difficult to work" at Jungle Jim's and caused her to suffer from anxiety, nervousness, and physical illness. Ellis further claimed that she would physically separate herself from Caldas by working in a different area of the seafood department than that occupied by Caldas. Given this evidence, we find that Ellis' has met her burden of showing that genuine issues of material fact exist with regard to whether she subjectively perceived the seafood department to be hostile and abusive. *See, e.g., Gallagher*, 567 F.3d at 273-274.

{¶ 27} On appeal, Caldas takes issue with Ellis' ability to demonstrate that he created a sexually hostile work environment. He points to Ellis' decision to accept a ride home from him on one occasion after the harassment allegedly began, her failure to personally

---

4. Specifically, Michal testified that she heard Caldas' discuss the size of his penis or other people's penises in the "general [way] most guys do."

approach management to complain about his alleged improper actions and conduct, and her request to remain working in the seafood department after his actions came to light as proof that she did not subjectively perceive his conduct to be abusive. He also makes repeated reference to the fact that other employees in the seafood department, such as Brinson and Rowland, denied witnessing the alleged harassment and expressed "disbelief" upon hearing about Ellis' claims. He argues that such evidence demonstrates that there was not an objectively hostile work environment. These issues, however, relate to the weight and credibility of the evidence and are not relevant in our consideration of his motion for summary judgment. *See, e.g., Spencer v. Spencer*, 12th Dist. Clermont No. CA86-09-062, 1987 WL 5969, *1 (Feb. 2, 1987) ("weighing the evidence involves an issue of credibility, and such is outside the province of a summary judgment proceeding").

{¶ 28} Given the evidence presented by the parties, we find that genuine issues of material fact remain as to whether Caldas' comments and actions created a hostile work environment based upon sexual harassment. *See Peterson*, 133 Ohio App.3d at 724 ("[w]hether a work environment is a hostile environment is a question of fact"). Ellis' first assignment of error is, therefore, sustained.

## VICARIOUS LIABILITY CLAIM

{¶ 29} Assignment of Error No. 2:

{¶ 30} THE TRIAL COURT ERRED IN GRANTING DEFENDANT JUNGLE JIM'S * * * MOTION FOR SUMMARY JUDGMENT AND FINDING NO DISPUTED ISSUE OF MATERIAL FACT THAT DEFENDANT JUNGLE JIM'S RESPONDED PROMPTLY AND EFFECTIVELY TO THE COMPLAINTS ABOUT DEFENDANT CALD[A]S' CONDUCT AND WAS THEREFORE RELIEVED OF ITS VICARIOUS LIABILITY FOR HIS ACTIONS.

{¶ 31} In her second assignment of error, Ellis contends the trial court erred when it granted Jungle Jim's motion for summary judgment on her claim that the supermarket was

vicariously liable for Caldas' sexual harassment. Specifically, Ellis argues the trial court erred when it found Jungle Jim's had not taken a tangible employment action against her and concluded that the "*Faragher/Ellerth*" affirmative defense barred her recovery.

{¶ 32} The United States Supreme Court has held that, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate * * * authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257 (1998). However, "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Faragher* at 807; *Ellerth* at 765. This defense, referred to by the parties as the "*Faragher/Ellerth* defense," is comprised of two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher* at 807; *Ellerth* at 765.

{¶ 33} The trial court found Caldas had not taken a tangible employment action against Ellis and ruled that Jungle Jim's was entitled to raise the *Faragher/Ellerth* defense. The court then determined Jungle Jim's had demonstrated it had a written sexual harassment policy that Ellis never took advantage of and that it "took immediate and appropriate corrective action under the policy" upon learning of Ellis' harassment allegations. Ellis challenges the trial court's findings, arguing that genuine issues of material fact exist with respect to whether a tangible employment action had been taken against her and whether Jungle Jim's exercised reasonable care to promptly correct Caldas' harassing behavior.

### Tangible Employment Action

{¶ 34} "A tangible employment action constitutes a significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth* at 761. *See also Peterson*, 133 Ohio App.3d at 725. Ellis contends a tangible employment action was taken against her when she was "demoted to the front line bagger position, with significantly diminished responsibility." However, "[f]or purposes of hostile work environment harassment, the tangible employment action *must have been taken by the alleged harasser*." (Emphasis added.) *Peterson* at 726. An employer is strictly liable for harassment by the supervisor— and the *Faragher/Ellerth* defense is unavailable—only when "*that supervisor* has taken a tangible employment action against the aggrieved employee. * * * It is not sufficient that a tangible employment action ultimately occurs; the tangible employment action must be directly linked to the harassment." (Emphasis sic.) *Edwards v. Ohio Inst. of Cardiac Care*, 170 Ohio App.3d 619, 2007-Ohio-1333, ¶ 25 (2d Dist.). Here, Ellis has not alleged nor offered evidence that Caldas instigated, caused, or participated in the decision to have her moved back to the bagging position. Rather, the evidence submitted by the parties demonstrates that the decision was made by Dick, the store manager. As Ellis failed to present any evidence that Caldas was responsible for taking a tangible employment action against her, we, like the trial court, conclude that Jungle Jim's was entitled to raise the *Faragher/Ellerth* defense.

### *Faragher/Ellerth* Defense

{¶ 35} Ellis argues that a genuine issue of fact exists as to whether Jungle Jim's met its burden of proving the first prong of the *Faragher/Ellerth* defense. Specifically, Ellis claims she presented evidence allowing a trier of fact to conclude that Jungle Jim's failed to use reasonable care to prevent or promptly correct Caldas' sexually harassing behavior.

{¶ 36} "Under the first prong of the [*Faragher/Ellerth*] defense, employers 'have an *affirmative duty* to prevent sexual harassment by supervisors.' * * * While the affirmative duty

- 17 -

on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there." (Emphasis sic.) *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349 (6th Cir.2005); *Edwards*, 2007-Ohio-1333 at ¶ 39. Rather, the first prong of the defense "requires an inquiry that looks behind the face of the policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." *Clark* at 349. *See also Thornton*, 530 F.3d at 456 (holding that an employer "generally satisfies" prong one of the test "when it has promulgated and enforced a sexual harassment policy"). While there is no exact formula for what constitutes a "reasonable" sexual harassment policy, courts have determined that an effective policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy. *Clark* at 349-350; *Thornton* at 456; *Gallagher*, 567 F.3d at 275.

{¶ 37} Jungle Jim's introduced evidence it implemented a sexual harassment policy requiring any of its employees who "[was] a victim of sexual harassment" or who "kn[e]w someone who [was]" a victim of sexual harassment, to report the harassment. The policy provided a mechanism for bypassing a harassing supervisor, stating that if the harasser was the employee's manager, then the employee was to report the harasser's conduct "to the person responsible for [the] manager's actions" or to the individual appointed to head up a committee on sexual harassment complaints. The policy does not, however, inform employees that their complaints may be informal and need not be placed in writing. *See, e.g., Shields v. Federal Express Customer Information Services, Inc.*, 499 Fed.Appx. 473, 479 (6th Cir.2012); *Sanford v. Main Street Baptist Church Manor, Inc.*, 327 Fed.Appx. 587, 596 (6th Cir.2009).

{¶ 38} Further, although Jungle Jim's had a sexual harassment policy in place at the time Ellis began her employment, there is an issue of fact as to whether Jungle Jim's actively implemented the policy or trained its employees and supervisors on the policy. Evidence was introduced that when Ellis received the policy in October 2012, the policy was not up-to-date as it advised Ellis to report sexual harassment complaints to "Norma Sarosy," who, according to Dick, had died in February 2012. Ellis was not provided with a revised copy of the policy informing her that Dick now chaired the committee responsible for investigating sexual harassment complaints. Dick also testified that prior to Ellis filing the present lawsuit, Jungle Jim's did not provide any sort of training to its employees regarding harassment or discrimination, although she did speak with some managers about the issues in an effort to train them.[5] Dick explained that although she had been placed in charge of training managers and investigating complaints about sexual harassment, she had not received any formal training or attended any seminars on the issue. Rather, her knowledge on the issue came from reading "two or three" books about harassment and discrimination over the last one to seven years.

{¶ 39} There is also an issue of fact as to whether implementation of Jungle Jim's

---

5. { a} At Dick's deposition, the following discussion was held:

> { b} [Attorney]:  Does Jungle Jim's provide any sort of training to its employees regarding harassment or discrimination?
>
> { c}  [Dick]:  No.
>
> { d} [Attorney]:  Does it provide any training to supervisors or managers regarding harassment or discrimination?
>
> { e} [Dick]:  I'm gonna say that it - - maybe not every manager because some managers don't go too long - - don't stay in their positions long.  I won't say that all of them have been.
>
> { f} [Attorney]:  Okay.  And for the ones that have been through any type of training, what does that entail, the training process?
>
> { g}  [Dick]:  It would be just me speaking with them about it.

sexual harassment policy was effective in practice in reasonably preventing and correcting harassing behavior. *See Shields* at 479. "[O]nce an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it." *Clark*, 400 F.3d at 349. Employers that take affirmative steps reasonably calculated to prevent and put an end to harassment—"such as personally counseling harassers, sending them letters emphasizing the company's policies and the seriousness of the allegations against them, and threatening harassers with serious discipline if future allegations are substantiated—are more likely to be deemed to have responded appropriately." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 342-343 (6th Cir.2008). Employers who fail to fully investigate a claim of harassment, fail to personally counsel harassers' about their improper conduct, and fail to monitor alleged harassers' conduct after receiving a complaint are less likely to be found to have responded appropriately. *See Shields*, 499 Fed.Appx. at 479-480.

{¶ 40} Here, Jungle Jim's introduced evidence that the day after Dick learned of the alleged sexual harassment from a third-party employee (Likoy), she spoke with Ellis and Caldas about the allegations. Dick instructed Caldas the complained of behavior was inappropriate, would not be tolerated, and could lead to termination if it continued. She then provided Caldas with a written warning, which was placed in his personnel file. When meeting with Ellis, she advised Ellis to inform her of any further problems and offered to move Ellis out of the seafood department. Once Ellis declined the offer to change departments, Dick modified Ellis' work schedule so Ellis would no longer work alone with Caldas. While this evidence tends to support Jungle Jim's contention that it proved the first prong of the *Faragher/Ellerth* defense, Ellis met her burden on summary judgment of introducing evidence creating issues of fact as to whether Jungle Jim's thoroughly investigated her allegations and whether its actions were reasonably intended to prevent and correct Caldas' sexually harassing behavior.

{¶ 41} Although Dick claimed to have spoken to various current and former members of the seafood department around May 5, 2013, and that no other employee substantiated Ellis' allegations, the two individuals she identified by name—Rowland and Michal—indicated that the first time they were approached by Dick about Caldas' actions was in June 2013. It was not until a month after Ellis' allegations first came to light and Ellis subsequently filed her complaint with the OCRC, that Dick asked anyone in the seafood department to prepare written statements regarding their observations of Caldas' behavior. At this time, Dick obtained written statements from only four individuals: Rowland, Michal, Segrist, and Gleason. She never spoke with Likoy or asked him for a written statement, even though he worked in the seafood department and was the employee who initially brought Ellis' problems to light. Dick also did not speak with Pease until May 1, 2014, nearly a year after Ellis first voiced her complaints. At this time Pease provided some substantiation for Ellis' claims, stating that he believed Caldas' had sexually harassed Ellis verbally. A jury hearing this evidence could find that Jungle Jim's, through Dick, should have conducted a more thorough investigation into Caldas' conduct when it was initially reported on May 4, 2013, and that such an investigation would have led to different preventative or corrective actions being taken against Caldas.[6] *See Shields*, 499 Fed.Appx. at 479-480.

{¶ 42} A jury could further find that leaving Caldas in the seafood department with Ellis after May 5, 2013, and only monitoring the situation with periodic walk-throughs in the department was unreasonable and inadequate in preventing and correcting Caldas' behavior. *See id.* This is especially true in light of Ellis' claim that she continued to complain about Caldas' behavior to management even after her schedule was changed so that she no longer

---

6. In fact, King conceded in his deposition testimony that additional, "much stronger" disciplinary action, including possible termination, would have been taken against Caldas had evidence substantiating Ellis' claims been discovered.

worked alone in the department with Caldas. There is no indication in the record that further action was taken by Jungle Jim's after Ellis told King during one of his walk-throughs that Caldas had continued to use foul language and make inappropriate comments after May 5, 2013.[7] According to Dick, Caldas was not asked to watch any videos, read any information, or undergo training on the issue of sexual harassment. Whether Jungle Jim's reasonably monitored and addressed Caldas' behavior is, therefore, a question for the finder of fact. *See McCombs v. Meijer, Inc.*, 395 F.3d 346, 355 (6th Cir.2005) (finding that where an employer's response to potential harassment could be construed as unreasonable or indifferent, the issue should be presented to the jury); *Smith v. First Union Natl. Bank*, 202 F.3d 234, 246 (4th Cir.2000) (finding summary judgment inappropriate where the plaintiff presented evidence creating an issue of fact as to whether her employer's sexual harassment policy was effective in practice in preventing and correcting the reported harassment).

{¶ 43} Accordingly, given the evidence presented by the parties, we find that genuine issues of material fact remain as to whether Jungle Jim's exercised reasonable care to prevent and correct promptly Caldas' sexually harassing behavior. Jungle Jim's has not proven the first prong of the *Faragher/Ellerth* affirmative defense and, therefore, cannot benefit from the defense at the summary judgment stage. *See Shields* at 481; *Clark*, 400 F.3d at 351. As Jungle Jim's must prove both prongs of the *Faragher/Ellerth* defense to invoke it, we decline to determine whether Jungle Jim's met its burden under the second prong of the defense by showing that Ellis unreasonably failed to take advantage of any complaint procedures it provided. *See id.*

---

7. Because we must construe the evidence in a light most favorable to Ellis, as the nonmoving party, we must accept as true Ellis' testimony that she complained to King of Caldas' actions. *See Ward*, 2013-Ohio-4762 at ¶ 13.

{¶ 44} Ellis' second assignment of error is sustained.

## RETALIATION CLAIM

{¶ 45} Assignment of Error No. 3:

{¶ 46} THE TRIAL COURT ERRED IN GRANTING DEFENDANT JUNGLE JIM'S * * * MOTION FOR SUMMARY JUDGMENT AND FINDING THAT THERE IS NO DISPUTED ISSUE OF MATERIAL FACT THAT DEFENDANT JUNGLE JIM'S UNLAWFULLY RETALIATED AGAINST DANA ELLIS.

{¶ 47} In her third assignment of error, Ellis argues the trial court erred when it granted Jungle Jim's summary judgment on her claim that she was removed from the seafood department and transferred back to a bagging position in retaliation for filing a complaint with the OCRC. Ellis contends she can demonstrate a prima facie case of retaliation and genuine issues of material fact exist with respect to whether Jungle Jim's has presented a legitimate, nonretaliatory reason for her transfer.

{¶ 48} "Ohio law prohibits retaliating against an employee who has opposed any unlawful discriminatory practice or has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under R.C. 4112.01 through 4112.07." *Bowers*, 2002 WL 449499 at *4, citing R.C. 4112.02(I). "When analyzing retaliation claims, Ohio courts rely on federal case law." *Id.*, citing *Peterson*, 133 Ohio App.3d at 727.

{¶ 49} "To establish a case of retaliation, a claimant must prove that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, ¶ 13. *See also Jordan*, 2007-Ohio-3830 at ¶ 31. If the claimant establishes her prima facie case, the burden

then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its action. *Temesi* at ¶ 14, quoting *McDonnal Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973). If the employer satisfies its burden, the burden shifts back to the complainant to demonstrate that the articulated reason was merely pretext, and not the "true reason for the employment decision." *Id.* A complainant can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the employer's adverse employment action, or (3) was insufficient to motivate the adverse employment action. *Lacey v. CTL Aerospace, Inc.*, 12th Dist. Butler No. CA2011-02-026, 2011-Ohio-4905, ¶ 23; *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526 (6th Cir.2008).

{¶ 50} In applying the above test to Ellis' retaliation claim, the trial court concluded Ellis could not establish her prima facie case because she could not demonstrate an adverse employment action had been taken against her or that there was a causal link between her filing of the complaint with the OCRC and her transfer out of the seafood department. The trial court determined there had been no "significant change" in Ellis' employment as she suffered no reduction in hours, pay, or benefits. The trial court found that being moved from a seafood clerk to a bagging clerk was a lateral transfer, as both were "entry level positions" and "some of the job duties were identical." The court then determined that even if Ellis had demonstrated a prima facie case of retaliation, Jungle Jim's had a legitimate, nondiscriminatory reason for transferring her out of the seafood department, as "her transfer was the best way to protect her from what may have been on-going, though undocumented, inappropriate conduct by Caldas." We disagree with the trial court's conclusions and find that Ellis has presented evidence which, if believed by the trier of fact, would establish a prima facie case of retaliation. Further, Ellis has raised genuine issues of material fact as to whether Jungle Jim's proffered reason for removing her from the seafood department was pretext for retaliation.

{¶ 51} It is undisputed that Ellis has satisfied the first two elements of her retaliation claim. Ellis engaged in a protected activity when she filed a complaint with the OCRC on May 28, 2013, alleging she was being sexually harassed. Jungle Jim's became aware of Ellis' protected activity when it was served with the complaint in early June 2013.

{¶ 52} With respect to whether Ellis has satisfied the third element of her retaliation claim, courts have consistently recognized that "[n]ot every act affecting an individual's employment can be considered an adverse, retaliatory action giving rise to liability." *Randolph v. Ohio Dept. of Youth Services*, 453 F.3d 724, 736 (6th Cir.2006). *See also Peterson*, 133 Ohio App.3d at 727; *Alexander v. Ohio State University College of Social Work*, 429 Fed.Appx. 481, 490-491 (6th Cir.2011). To support a claim of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Internal quotations omitted.) *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68,126 S.Ct. 2405 (2006). *See also Alexander* at 490 ("a plaintiff must show that the action was 'materially adverse' from the standpoint of a 'reasonable employee'"). "In determining whether an employee's change is material, [a court] must consider the context of the action." *Randolph* at 736.

{¶ 53} Here, Ellis has presented evidence creating an issue of material fact as to whether a reasonable employee would have found being moved from the seafood department back to a bagging position materially adverse. Although Ellis did not suffer an immediate pecuniary loss as a result of the transfer, as her pay and hours remained the same, she presented evidence that would allow a trier of fact to conclude that the transfer significantly diminished her job responsibilities and acted to dissuade a reasonable worker from making a charge of discrimination. As a seafood clerk, Ellis had responsibilities different than those of a bagger, including cleaning, filleting, and selling fish. According to

Ellis and Brinson, working as a seafood clerk allowed an employee to learn skills that could not be learned working as a bagger or as a cashier. Caldas testified those who held a position in the seafood department had a "greater level of responsibility than [those in] bagging." He stated that being a seafood department employee is "very intense" and that it takes two to three years to learn "everything" relevant to working in the department. According to Caldas, among the skills that an employee learns while in the department is how to properly filet and bone over 200 species of fish, what species of fish are available for sale during the various seasons throughout the year, and how to properly store and display the various fish and seafood. Ellis had started to learn these skills during the four months she spent in the seafood department before she was removed on June 5, 2013. Ellis' responsibilities changed when she was transferred back to a bagging position and she was no longer provided with the opportunity to continue learning these new skills. Reasonable minds could conclude that being moved from the seafood department was an adverse employment action which would dissuade a reasonable worker from making a charge of discrimination. Ellis, therefore, has presented evidence raising a genuine issue of material fact as to this element of her retaliation claim.

{¶ 54} Ellis has also presented evidence sufficient to raise the inference that her protected activity of filing a complaint with the OCRC was likely the reason for her transfer from the seafood department. "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action" with the OCRC. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). *See also Lacey*, 2011-Ohio-4905, ¶ 20. A causal connection may be shown through direct evidence or through knowledge coupled with a closeness in time that creates an inference of causation. *Knepper v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1155, 2011-Ohio-

6054, ¶ 27, citing *Nguyen* at 566. "Close temporal proximity between the employer's knowledge of the protected activity and the adverse employment action alone may be significant enough to constitute evidence of a causal connection, but only if the adverse employment action occurs 'very close' in time after an employe[r] learns of a protected activity." *Id. See also Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508 (2001); *Mickey*, 516 F.3d at 525; *Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App.3d 722, 2005-Ohio-4978, ¶ 29 (8th Dist.). However, where some time elapses between when the employer learns of the protected activity and the subsequent adverse employment action is taken, the employee must produce other evidence of retaliatory conduct to establish causation. *Knepper* at ¶ 28; *Mickey* at 525.

{¶ 55} In the present case, an inference of causation may be deduced from temporal proximity. Ellis filed her claim with the OCRC on May 28, 2013, and it was subsequently served on Jungle Jim's in early June 2013.[8] Immediately after being served with the OCRC complaint, Jungle Jim's informed Ellis she was being removed from the seafood department.[9] On June 5, 2013, Ellis was transferred back to a bagging position. Under the facts of this case, where Jungle Jim's removed Ellis immediately after learning of her protected activity, we can infer a causal connection between the two actions even though Ellis has not presented other evidence of retaliation. *See Mickey* at 525-526 ("if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be

---

8. It is unclear from the record the exact date Ellis' OCRC complaint was served on Jungle Jim's. However, testimony from Dick indicates that the complaint was served "about the time" she obtained the June 5, 2013 written statements from Rowland, Michal, Segrist, and Gleason.

9. Because the exact date the OCRC complaint was served on Jungle Jim's is unknown, we are unable to determine whether Ellis was removed from the seafood department on the very day that Jungle Jim's learned of the OCRC complaint. Regardless of whether Ellis was removed on the same day that Jungle Jim's received the OCRC complaint, or whether a few days passed before she was removed, the timing of her removal from the seafood department was in very close temporal proximity and, therefore, creates an inference of causation sufficient to overcome summary judgment.

unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation"). Accordingly, we find Ellis has met her burden on summary judgment of demonstrating that genuine issues of material fact exist as to whether she can prove a prima facie case of retaliation.

{¶ 56} We further find that Ellis has presented evidence raising a genuine issue of material fact as to whether Jungle Jim's proffered reason for removing her from the seafood department was mere pretext. Jungle Jim's claimed Ellis was removed once it learned of her OCRC complaint in order to protect Ellis from any on-going, though undocumented, inappropriate conduct by Caldas. Although this reason, if believed, would constitute a legitimate business reason, Ellis presented evidence that would permit a reasonable jury to conclude that Jungle Jim's articulated reason was a mere pretext and not the real reason why she was transferred out of the seafood department. Specifically, Ellis presented evidence raising an issue of fact as to whether Jungle Jim's need to protect her was the company's "actual motive" for removing her from the seafood department.

{¶ 57} Here, Ellis introduced evidence that she had complained of Caldas' behavior to management on two occasions—first, to Dick and King on May 4, 2013, and second, to King sometime after May 4, 2013.[10] Even though Ellis made complaints about Caldas' behavior before June 5, 2013, there is no indication in the record that Jungle Jim's felt that the best way to "protect" Ellis was to remove her from the seafood department. Rather, management, apprised of the on-going situation, left her in Caldas' department for a month—up until she filed her complaint with the OCRC.

---

10. The parties presented conflicting evidence as to whether Ellis complained about Caldas' behavior to management after May 4, 2013. Because we must construe the evidence in a light most favorable to Ellis, as the nonmoving party, we must accept as true Ellis' testimony that she complained to King of Caldas' actions for purposes of summary judgment. *See Ward*, 2013-Ohio-4762 at ¶ 13.

{¶ 58} Although Jungle Jim's claims it removed Ellis in order to protect her from Caldas' actions, a jury could determine Ellis was removed as a way of penalizing her for complaining about being sexually harassed. As we discussed in our resolution of Ellis' second assignment of error, issues of fact exist as to whether Jungle Jim's reasonably investigated or acted to prevent Caldas' behavior. A jury could determine Jungle Jim's decision to remove Ellis from the seafood department, rather than suspending Caldas or transferring him to another department pending further investigation, was done to penalize Ellis for making continued complaints about Caldas' actions. A jury could infer from the evidence Ellis presented that Jungle Jim's was determined to keep Caldas as the acting manager in the seafood department, even if it meant ignoring Ellis' complaints and removing her from the department as a way of obscuring Caldas' behavior and protecting his position.

{¶ 59} Jungle Jim's contends that once it learned of Ellis' OCRC complaint, it was "left with the Hobson's choice of leaving Ellis in Seafood (where Ellis' alleged harassment was occurring, and potentially facilitating the harassment), or moving Ellis out, and being accused of retaliation." Jungle Jim's argues that it cannot be faulted for its decision to remove Ellis to protect her, even if there were different ways it could have handled the situation or acted to protect her, as it is not up to the court to question its business decisions or judgments. While it is true that courts generally will not second-guess an employer's business judgment regarding personnel matters, "summary judgment is not appropriate every time an employer offers this 'business judgment' rationale" in defense of its actions. *Mickey*, 516 F.3d at 527, quoting *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir.1996). A finder of fact is entitled to call into question the genuineness of the employer's business judgment where an employee introduces evidence that the business decision was obviously lacking in merit. *Id.*; *Kundtz v. AT&T Solutions, Inc.*, 10th Dist. Franklin No. 05AP-1045, 2007-Ohio-1462, ¶ 32. Here, Ellis has presented sufficient evidence to call into question the genuineness of Jungle Jim's

assertion that Ellis was removed from the seafood department to "protect" her from Caldas' actions. From the evidence in the record, a finder of fact could conclude that Jungle Jim's proffered reason for removing Ellis from the seafood department was not a business decision but, rather, was "a reason manufactured to avoid liability." *Hartsel* at 800.

{¶ 60} As Ellis has presented evidence creating issues of fact as to her ability to prove a prima facie case of retaliation and she has rebutted Jungle Jim's asserted nondiscriminatory reason for her removal from the seafood department with evidence of pretext, we find that the trial court erred when it granted summary judgment to Jungle Jim's. Ellis' third assignment of error is, therefore, sustained.

## CONCLUSION

{¶ 61} For the reasons set forth above, we reverse the decision of the trial court awarding summary judgment to Caldas and Jungle Jim's, and we remand the matter for further proceedings consistent with this opinion.

{¶ 62} Judgment reversed and remanded.

M. POWELL, P.J., and RINGLAND, J., concur.